**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

**MICHAEL TURNER**                                           **PLAINTIFF**

**VS.**                              **CIVIL ACTION NO.: 2:24-CV-195-KS-MTP**

**CITY OF COLUMBIA, MISSISSIPPI**                     **DEFENDANT**

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant the City of Columbia respectfully submits this Memorandum in Support of

Motion for Summary Judgment, as follows:

**INTRODUCTION**

This is an employment dispute between Plaintiff Michael Turner and Defendant the City

of Columbia.  Turner's theory is that he was terminated from his detective position because he

spoke to a state auditor investigator about potential misconduct within the police department.  He

brings retaliation claims under federal and Mississippi law.

All claims fail for a simple reason: Turner hasn't alleged, and certainly cannot prove, that

a majority of the City's Board of Aldermen even knew he spoke to an investigator, much less that

they terminated him because of it.  This is dispositive because the Board of Aldermen controls

employment decisions under Mississippi law and governing law requires a plaintiff to show

unlawful animus on behalf of a majority of the board members to recover.

Turner's claims have other problems too, including the failure to prove additional elements

under the First Amendment and failure to satisfy the Mississippi Tort Claims Act ("MTCA")

hurdles.  Any of the problems is independently sufficient to grant summary judgment.  This case

should be dismissed.

## RELEVANT FACTUAL BACKGROUND

The City of Columbia is a municipality located in Marion County, Mississippi.  It operates under a Mayor/Board of Aldermen form of government.[1]  Under this form of government, "the mayor has superintending control of the municipality, i.e., general oversight and supervision of municipal departments[,]" and the Board of Aldermen possess ultimate authority over hiring, firing, and pay decisions.  Op. Att'y Gen., 2010 WL 942883 (MISS. A.G. 2010); Op. Att'y Gen. 1990 WL 547751 (MISS. A.G. 1990).

Turner, a thirty-six-year-old law enforcement officer from east Alabama, worked in law enforcement roles for seven different counties and cities in Alabama before moving to Mississippi.[2]  He's held two law enforcement jobs in Mississippi: one with the City of Columbia, and he is currently employed with the City of Lumberton.[3]

The City hired Turner as a certified, full-time patrol officer, effective December 2021, upon recommendation of (former) Chief of Police Michael Kelly.[4]  Turner was later promoted to the full-time position of Major Crimes Detective in December 2023, where he served alongside Major Crimes Detective David Thompson.[5]  During the relevant period, Turner was supervised by several people, including Major Crimes Lieutenant Justin Porter and Major Crimes Lieutenant Lance Poirier, as well as Captain Chris Bush and Chief of Police Michael Kelly.[6]

---

[1] *E.g.*, Exhibit A, July 16, 2024 Board Minutes at 1.

[2] Exhibit B, Excerpts of Michael Turner's Deposition Tr., at 17–38.

[3] *Id.* at 163–164.

[4] *Id.* at 45.

[5] *Id.* at 59–60, 71.

[6] *Id.* at 62–64.

PD.53870361.1

Throughout most of his tenure with the City, Turner claims that he maintained a "good relationship" with Kelly, who was a close friend and someone Turner "confided in" "a lot."[7] During his deposition, Turner mentioned that he and Kelly attended church together and "[h]ung out" while off duty.[8]  Turner also had a strong relationship with Bush, considering him one of his best friends.[9]  Turner was in Bush's wedding as the "flower man" and had previously supervised Bush's wife while on patrol before Turner was promoted to detective.[10]

According to Turner, his relationship with Bush began to deteriorate towards the end of 2023 when Bush started appearing "check[ed] out" from his work responsibilities.[11]  This led Turner to confront Bush, stating "you're not good for this department," which marked the beginning of the end of their strained relationship.[12]  Similarly, according to Turner, his relationship with Kelly began to decline in March or April 2024, when Turner approached Kelly to discuss Bush's alleged misconduct (i.e., allegedly stealing time). [13]  Turner testified at his deposition that he felt as if Kelly was "distancing himself" and became less communicative with him after he approached Kelly about Bush's work hours.[14]  Turner also testified that he discussed the matter with Mayor Justin McKenzie and Alderwoman Anna Evans around the same time.[15]

---

[7] *Id.* at 72–73.

[8] *Id.*

[9] *Id.* at 84, 86.

[10] *Id.*

[11] *Id.* at 86–87.

[12] *Id.*

[13] *Id.* at 75, 80, 82.

[14] *Id.* at 110.

[15] *Id.* at 80–81.

PD.53870361.1

In short, Turner believed that Bush was engaging in time theft as he observed Bush's decreasing presence at the police department.[16]  This situation frustrated Turner, as he believed Kelly was allowing it to happen, or allowing Bush to maintain a more lenient work schedule, even if it was not illegal.[17]

Turner alleges in his complaint that, on May 20, 2024, a local investigator from the Columbia area, employed by the state auditor, contacted him, Detective Thompson, and Executive Assistant to the Chief of Police Danielle Barber to provide a statement concerning the allegations of Bush stealing time.[18]  Turner testified that he, Thompson, and Barber all spoke with the investigator on the same day.[19]  Turner further testified that he only spoke to the investigator once and did not provide a written statement.[20]  During his deposition, Turner stated that he believed he was acting in the course and scope of his employment when speaking to the investigator, although he did not inform Kelly or any other city official that he'd done so.[21]

Kelly learned that Turner spoke to the local investigator soon thereafter.[22]  Turner claims that, after Kelly learned of his cooperation with the local investigator, his opportunity to earn overtime was changed to flex time and he lost administrative privileges on the department's RMS reporting system, which hindered his ability to access and update reports and profiles.[23]

---

[16] *Id.* at 74.

[17] *Id.*

[18] Compl. [1-1] at 2; *see also* Exhibit B, Excerpts of Michael Turner's Deposition Tr., at 96.

[19] Exhibit B, Excerpts of Michael Turner's Deposition Tr., at 96.

[20] *Id.* at 106.

[21] *Id.* at 82.

[22] *Id.* at 103.

[23] *Id.* at 134 (identifying overtime, kids at the police department policy, and the changes to the RMS system as the three things that allegedly changed after he spoke to the investigator); *see also id.* at 128 (clarifying that Kelly's policy about employees' kids hanging out at the police department during works hours did not affect him).

But there is context to add.  In the spring of 2024, Mayor McKenzie instructed Kelly to reduce overtime hours worked by his officers.[24]  Indeed, the Mayor testified during his deposition that "overtime [in the police department] was running rampant" and that "Chief Kelly had never been talked to and no one on the Board [of Aldermen] has ever talked [] the way that I talked to Chief Kelly in front of this [B]oard prior to him going back there and cutting out all of the overtime."[25]  Kelly in turn communicated this directive to Turner and Thompson.[26]  A few days later, while unaware that the Mayor was pressuring Kelly to address overtime issues, an upset Turner, along with Thompson, submitted timesheets indicating nine-hour workdays without document the specific actions performed.[27]  Upon discovering this, Kelly reiterated that detectives could not set their own overtime hours, without prior approval, insisting that Turner and Thompson take flex time (i.e., if they work an extra hour, then they need to take an hour off the next day or sometime that next week to offset the potential overtime), and informed the Mayor.[28]

This led to a meeting between Mayor McKenzie, Kelly, Turner, and Thompson.[29]  In the meeting, Mayor McKenzie warned against self-assigning overtime.[30]  Interestingly, Turner responded by admitting that he was intentionally trying to "piss off" Kelly, further angering the

---

[24] Exhibit C, Excerpts of Justin McKenzie's Deposition Tr., at 14.

[25] *Id.*

[26] Exhibit B, Excerpts of Michael Turner's Deposition Tr., at 117.

[27] Exhibit B, Excerpts of Michael Turner's Deposition Tr., at 118–119; *see also* Exhibit C, Excerpts of Justin McKenzie's Deposition Tr., at 27–28.

[28] Exhibit B, Excerpts of Michael Turner's Deposition Tr., at 118–120; *see also id.* at 136–37 (Turner testifying that, despite his complaints about the limitation on overtime, he was still permitted to earn overtime if he "legit got called out," like he was required to physically go to the scene.); Exhibit C, Excerpts of Justin McKenzie's Deposition Tr., at 29.

[29] Exhibit C, Excerpts of Justin McKenzie's Deposition Tr., at 27–28.

[30] *Id.*

Mayor, who then warned Kelly not to allow it again.[31] The Mayor, who is a former long-term law enforcement officer himself, testified at his deposition that when he heard Turner say that he was intentionally trying to piss off Kelly, if he was Chief of Police, he would have requested that the Board of Aldermen terminate Turner right then, that same day.[32]

Turner's allegations concerning the RMS system hold no water. Particularly, he asserts that he "lost" all privileges on the RMS system.[33] That's not entirely accurate. Turner testified at his deposition that his access was limited to reviewing items on the RMS, whereas previously, he had the ability to make changes to other officers' work product.[34] In any event, these administrative privileges were changed by his immediate supervisor, Poirer, not Kelly. It is also not an adverse action for First Amendment purposes.[35] More on that later.

Turner's employment problems worsened in the weeks leading to termination.

- On July 2, 2024, Poirier instructed Turner to provide a spreadsheet detailing active cases and their statuses by July 10, 2024. Turner did not comply.

- On July 6, 2024, Turner, serving as the primary on-call investigator, was unreachable during a shooting incident. Despite multiple attempts by an officer, Poirier, and dispatch to contact him, Turner did not respond. Poirier informed Kelly and personally responded to the scene.

- Two days later, on July 8, Turner explained he did not hear his phone on July 6 and offered no explanation for not returning calls on July 7. Poirier then announced changes to the on-call schedule, prompting Turner to react angrily, suggesting Poirier would be disliked for being the "Chief's bad guy" and that Poirier be fired when the Chief was dismissed.

- On July 11, Turner accused Poirier of revoking his access to internal investigatory software for reviewing evidence. He told Poirier that Kelly was manipulating him and threw a document on Poirier's desk, saying, "You can do it from now on." Poirier answered that

---

[31] *Id.*; *see also* Exhibit B, Excerpts of Michael Turner's Deposition Tr., at 122 ("I did it to be a smart-ass.").

[32] Exhibit C, Excerpts of Justin McKenzie's Deposition Tr., at 27–28.

[33] Exhibit B, Excerpts of Michael Turner's Deposition Tr., at 128–129.

[34] *Id.* at 132–133.

[35] Exhibit D, Lance Poirer Emails.

investigatory procedures remained unchanged, but supervisors were now required to review investigatory case files before submission to the district attorney's office.

- On July 12, Turner repeated accusations against Poirier regarding access to CID software, stating it was now the Lieutenants' responsibility to manage everything, and expressed that he no longer cared about case files reaching the district attorney's office, attributing any issues to supervisors rather than himself. Poirier still had not received the requested spreadsheet of active cases from Turner.

Poirier reported all of these issues to Kelly, where were in turn communicated to the Board of Aldermen.[36]

On July 16, 2024, the Board of Aldermen entered into executive session to discuss Turner's employment problems. In executive session, Kelly presented the printout emails from Turner's supervisor, Poirer, to the Board of Aldermen.[37] The board members also discussed the incident where Turner intentionally self-reported overtime and candidly admitted to both the Mayor and Kelly that he'd done so deliberately to piss off Kelly.[38] Based on what was discussed in the executive session, the Board of Aldermen voted to terminate Turner's employment due to insubordination, disrespect toward other officers, and deficient performance.[39]

Shortly thereafter, Turner, who'd obtained an attorney, filed a post-termination grievance with the City and, at his request, appeared at an October 15, 2024 board meeting.[40] There, Turner spoke to the Mayor and the Board of Aldermen and requested to be rehired with the police department. Ultimately, no board action was taken on Turner's request for rehire.[41]

---

[36] *E.g.*, *id.*

[37] Exhibit C, Excerpts of Justin McKenzie's Deposition Tr., at 22–25.

[38] Exhibit E, Excerpts of Mike Smith's Deposition Tr. at 13–16.

[39] *E.g.*, Exhibit A, July 16, 2024 Board Minutes at 5.

[40] Exhibit F, October 15, 2024 Board Minutes.

[41] *Id.*

PD.53870361.1

## RELEVANT PROCEDURAL HISTORY

On November 18, 2024, Turner filed the instant lawsuit solely against the City in Marion County Circuit Court, alleging First Amendment retaliation under the U.S. and Mississippi Constitutions and wrongful discharge under the *McArn* doctrine.[42]  The City timely removed the case to this Court and filed an answer on December 31, 2024.[43]

During discovery, Turner deposed ten individuals.  Those included Mayor McKenzie, current Chief of Police Adrien Fortenberry, four of the five Board of Aldermen, and four current City employees.  Turner did not depose Kelly.  The City deposed Turner.  The City now seeks summary judgment on all claims under Federal Rule of Civil Procedure 56.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  A fact is material only if it is essential to the plaintiff's cause of action under an applicable theory of recovery and the plaintiff could not prevail without it.  *Celotex v. Cartrett*, 477 U.S. 317, 322–23 (1986).  The movant's burden is to merely point out the absence of evidence supporting the nonmovant's case.  *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996).

Once the movant meets this burden, the nonmovant must go beyond the pleadings and "identify specific evidence in the record, and articulate the 'precise manner' in which that evidence support[s] [his] claim."  *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).  Allegations without substance will not defeat summary judgment.  *Celotex*, 447 U.S. at 321.  If the nonmovant fails to meet this burden, the motion for summary judgment must be granted.  *Stults*, 76 F.3d at 656–57

---

[42] Compl. [1-1].

[43] Notice of Removal [1]; Answer [4].

(citing *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995)).

## ARGUMENT & AUTHORITIES

Turner advances three claims in this lawsuit. The first is a federal claim under § 1983, asserting that his termination was an act of retaliation in violation of his First Amendment rights. He also brings the same claim under the Mississippi Constitution. The third claim is a state-law claim for wrongful discharge under the *McArn* doctrine. Although the analysis overlaps, each claim is addressed separately, beginning with the First Amendment retaliation claim under federal law. All claims must be dismissed.

### <u>Federal Law</u>

The legal framework that applies to Turner's First Amendment retaliation claim is well-settled. For there to be liability against the City, Turner must show that (1) a violation of a federal right occurred and that (2) a governmental policy or custom was the moving force behind the violation. *Shumpert v. City of Tupelo*, 905 F.3d 310, 316 (5th Cir. 2018) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

As explained in more detail below, Turner's First Amendment retaliation claim is deficient in its totality. Most fundamentally, there can be no liability against the City because there is no evidence of a constitutional violation. But, even if Turner could show a constitutional violation (which he cannot), there is still no liability because he cannot establish a basis for *Monell* liability against the City.

**I.      Turner cannot establish an underlying constitutional violation of First Amendment retaliation against the City based on termination.**

To prove First Amendment retaliation, Turner must demonstrate that (1) he suffered an adverse employment action, (2) he engaged in citizen speech on a matter of public concern, (3) his speech interest outweigh the City's interest in governmental operations, and (4) his speech caused

9

an adverse employment action. *Wetherbe v . Tex. Tech Univ. Sys.*, 138 F.4th 296, 303 (5th Cir. 2025); *see also Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015). The fourth element, causation, is the most straightforward pathway to dismissal; namely, Turner cannot show that the City's decision to terminate him was caused by his single conversation with a local state official.

### A.    Turner lacks causation.

It is undisputed that employment decisions within the City are made by a prevailing vote of the Board of Aldermen. This type of "collective decision-making is less susceptible" to unlawful retaliatory animus. *Wu v. Miss. State Univ.*, 626 F. App'x 535, 538 (5th Cir. 2015) (quoting *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 806 n.2 (5th Cir. 2007)).

This is critical in the First Amendment context, where the governing authority is a board, because Turner bears the burden of showing that <u>a majority of the individual board members had retaliatory animus against him</u>. *Griggs v. Chickasaw County*, 930 F.3d 696, 704 (5th Cir. 2019) ("We agree that [the plaintiff] was required to show that a majority of the Board had retaliatory animus."). In other words, <u>it is not enough for Turner to submit evidence that one alderperson acted (or failed to act) for an unlawful reason or that an allegedly biased alderperson supplied the deciding margin</u>. *Id.* Under the controlling Fifth Circuit precedent, the law is clear: Turner must show that three of the five Board of Aldermen voted to terminate his employment *because* he made a protected complaint to the local investigator. *Id.* This, he cannot do.

It is clear from the summary judgment record that Turner lacks evidence demonstrating that a majority of the board members bore the requisite unlawful animus at the time of termination. Three board members—Alderman Mike Smith, Alderman Jason Stringer, and Alderman Wendell Hammond—voted in favor of termination.[44]    One board member, Alderwoman Anna Evans,

---

[44] Exhibit A, July 16, 2024 Board Minutes at 5.

abstained, and one board member, Alderwoman Andrea Porter, was not present at the board meeting (so she did not case a vote).  When questioned about the board members' decisions to vote in favor of termination, Turner testified during his deposition that his understanding of their reasons is based solely on the content of each board member's deposition.[45]  He also testified that he never spoke to any board members before the board meeting about anyone's reason to vote in favor termination and that he never spoke any of the board members who voted in favor of termination after the board meeting about their reason.[46]

Of the three board members who voted in favor of termination (Smith, Stringer, and Hammond), only two board members were deposed (Smith and Stringer).  Fatal to his claim, Alderman Smith testified at his deposition that he was <u>unaware</u> of Turner's conversation with the local investigator from the auditor's office at the time of termination—a necessary condition of a retaliation claim is that the decision-maker have knowledge of the protected activity at issue—and recalled Turner stating that he self-reported overtime to intentionally "piss off" Kelly.[47]  *E.g.*, *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 n.6 (5th Cir. 2003) ("If the decisionmakers were completely unaware of the plaintiff's protected activity, then it could not be said (even as an initial matter) that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity.").[48]  Similarly, Alderman Stringer testified at his

---

[45] Exhibit B, Excerpts of Michael Turner's Deposition Tr., at 161–63.

[46] *Id.*

[47] Exhibit E, Excerpts of Mike Smith's Deposition Tr., at 13–16.

[48] Countless Fifth Circuit and district court cases have held the decision-maker must have knowledge of the protective activity at issue. A sampling follows: *E.E.O.C. v. EmCare, Inc.*, 857 F.3d 678, 683 (5th Cir. 2017); *Russell v. McKinney Hosp. Venture*, 253 F.3d 219, 227 (5th Cir. 2000); *Watts v. Kroger Co.*, 170 F.3d 505, 512 (5th Cir. 1999); *see also, e.g.*, *Dearman v. Stone Cnty. Sch. Dist.*, No. 1:13-CV-267, 2015 WL 13063806, at *6 (S.D. Miss. June 22, 2015) ("[I]t is axiomatic that a party cannot be 'substantially motivated' by a circumstance of which that party is unaware." (quoting *Tharling v. City of Port Lavaca*, 329 F.3d 422, 428 (5th Cir. 2003))).

deposition that he didn't have an issue with Turner speaking with the local investigator but voted in favor of termination because Turner was defiant to Poirer and Kelly.[49]  Alderwoman Evans, who abstained from the vote, explained during her deposition that she abstained because she was "tired of hiring and firing people" and that "it could have been Michael Turner or Joe Blow, [she] would have [voted] the same way."[50]  Mayor McKenzie, who was present at the board meeting, testified that he "[did not] believe that [Turner's conversation with the investigator] had any grounds for why he was terminated by the Board of Aldermen."[51]

It is also noteworthy that Turner lacks personal knowledge of why the third board member, Alderman Hammond, voted in favor of termination because Hammond was not deposed. This is significant because, when putting everything together, there is no credible evidence that any of the five board members, much less a majority of them, terminated Turner *because* of his statement to the local investigator.  *Griggs*, 930 F.3d at 704.

Lastly, it is undisputed that, in addition to Turner, Thompson and Barber provided verbal statements to the local state investigator.[52]  Notably, the uncontroverted evidence shows that neither of these employees were terminated or faced any form of discipline from Kelly, or the City.[53]  This undisputed fact further indicates that Turner's termination was not due to him providing a statement to a local investigator.  *See Lozman v. City of Riviera Beach*, 585 U.S. 87,

---

[49] Exhibit G, Excerpts of Jason Stringer's Deposition Tr., at 11–12.

[50] Exhibit H, Excerpts of Anna Evans's Deposition Tr, at 16.

[51] Exhibit C, Excerpts of Justin McKenzie's Deposition Tr, at 58.

[52] Exhibit B, Excerpts of Michael Turner's Deposition Tr, at 105.

[53] Exhibit I, Excerpts of Danielle Barber's Deposition Tr., at 35 ("Q. Did Kelly discipline you? A. No. Q. Did Kelly discipline Thompson? A. No."); *see also* Exhibit C, Excerpts of Justin McKenzie's Deposition Tr, at 53.

100 (2018) (explaining a retaliation claim against a municipality requires the plaintiff to "prove the existence and enforcement of an official policy motivated by retaliation").

In sum, Turner's First Amendment retaliation claim cannot survive summary judgment because he lacks evidence demonstrating that his conversation with a local investigator was the but-for cause of the City's decision to terminate his employment. *See Degenhardt v. Bintliff,* 117 F.4th 747, 758 (5th Cir. 2024) ("It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must be . . . 'but-for' cause meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." (quoting *Nieves v. Bartlett,* 587 U.S. 391, 403 (2019))).  Re-stated, Turner has no evidence demonstrating that a majority of the Board of Aldermen bore retaliatory animus toward him because he spoke to a local investigator. *Griggs*, 930 F.3d at 704.  On this ground alone, Turner's First Amendment claim fails.[54]

\*      \*      \*

---

[54] Turner has not invoked a cat's paw theory of liability, but even if he had, it would fail.  For one thing, a cat's paw theory isn't a viable theory under § 1983. *E.g.*, *Jones v. City of Hutto*, No. 24-50096, 2025 WL 2832635, at *6 (5th Cir. Oct. 7, 2025) ("Jones does not cite any case in which the Fifth Circuit applied cat's paw to a *Monell* claim and we are similarly unaware of any such authority. In fact, our cases impliedly reject the theory in *Monell* contexts. (citations omitted)); *Perez v. City of Austin*, No. A-07-CA-44, 2008 WL 11334097, at *5 (W.D. Tex. Sept. 2, 2008) ("Allowing a Plaintiff to bring suit under § 1983 for employment discrimination, and then permitting him to avoid the *Monell* doctrine by use of [the cat's paw] doctrine would plainly be permitting circumvention of established principles. Thus, the 'cat's paw' theory cannot solve the Plaintiff's problem with being unable to demonstrate the existence of a policy or practice which caused Plaintiff's termination." (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 128–30 (1988))); *accord Naumovski v. Norris*, 934 F.3d 200, 222 (2d Cir. 2019)  ("Section 1983 claims for discrimination in public employment cannot be based on a respondeat superior or 'cat's paw' theory to establish a defendant's liability.").  For another thing, it wouldn't apply anyway, and Turner cannot show how it would apply in this case. *Waters v. City of Chicago*, 580 F.3d 575, 586 n.2 (7th Cir. 2009) ("Imputing a nondecisionmaker's motive to a municipal employer sounds a lot like respondeat superior liability.").

13

Causation is the most straightforward pathway to dismissal on the First Amendment claim. The City presents the following arguments as additional and independent reasons to dismiss the First Amendment claim.

**B.**     **Turner's speech is unprotected because it was made pursuant to his official duties as Major Crimes Detective.**

Even if Turner's conversation with the local investigator was the but-for reason he was terminated, his speech was not protected speech, as it was made pursuant to his official duties as Major Crimes Detective. "For an employee's speech to be entitled to First Amendment protection, he must be speaking as a citizen on a matter of public concern." *Graziosi v. City of Greenville*, 775 F.3d 731, 736 (5th Cir. 2015). When a public employee speaks pursuant to his official duties, he does not speak as a citizen for First Amendment purposes and his statements are not entitled to constitutional protection. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

*Walker v. Smith*, 801 F. App'x 265 (5th Cir. 2020), is illustrative here. In that case, Walker, an Assistant District Attorney in Hinds County, was made aware of an anonymous letter that alleged she had written numerous "bad" checks in her past. *Id.* at 267–68. After reporting the contents of the letter to her superior, Smith, Walker became concerned that the security of the District Attorney's "Bad Check Unit" had been "breached . . . to actively, purposely, and with malicious intent seek information to use threaten, coerce, harass and intimate . . . an officer of the court." *Id.* at 268 (alterations in original). Walker then requested and received authorization from Smith to report the possible security breach to the Mississippi Bureau of Investigation ("MBI"). *Id.* Roughly six months later, Smith fired Walker from the District Attorney's office due to her "history of writing worthless checks . . . ." *Id.*

Walker sued Smith, *inter alia*, for First Amendment retaliation, alleging that Smith retaliated against her because she chose to contact MBI to investigate a possible breach in the Bad

Check Unit. *Id.* Upon review, the district court dismissed her claim, and the Fifth Circuit affirmed. In affirming the district court, the appeal panel explained that Walker failed to demonstrate that her correspondence with MBI was *not* an "official duty" because she reached out to her superior to report the possible breach: "Walker's complaint to the MBI should be viewed only as a continuation of her up-the-chain report to the employer, Smith." *Id.* at 272–73.

The same is true here. Turner explained that he initially addressed the alleged stealing time issue with Chief Kelly, and then separately with Mayor McKenzie and Alderwoman Evans.[55] Turner also testified that he did not feel that speaking to the local investigator was outside the scope of his job duties as detective and that, in his role as Major Crimes Detective, he routinely spoke to outside agencies.[56]

In other words, like *Walker*, the summary judgment evidence indicates that Turner believed his complaints were related to his "official duties" as Major Crimes Detective and that he needed to report his actions to City officials up the "chain of command." *See Wilson*, 787 F.3d at 325 (when chief sheriff deputy relayed concerns about video and audio equipment in interrogation rooms to sheriff and internal affairs, "he was simply reporting potential criminal activity up the chain of command" and "was acting in his official duties as the [c]hief [d]eputy").

### C.    Turner did not speak on a matter of public concern.

Even if Turner spoke as a citizen, his speech was not on a matter of public concern. "It is well established that speech exposing or otherwise addressing malfeasance, corruption or breach of the public trust . . . touches upon matters of public concern," *Graziosi*, 775 F.3d at 738—but content, alone, is not dispositive. *Sagle v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 186 (5th Cir.

---

[55] Exhibit B, Excerpts of Michael Turner's Deposition Tr., at 80.

[56] *Id.* at 82, 104.

PD.53870361.1

2006). More specifically, the Fifth Circuit also looks at the context and form of the speech to evaluate "the extent to which the [] employee spoke as a citizen or employee." *Gillum v. City of Kerrville*, 3 F.3d 117, 121 (5th Cir. 1993) (per curiam). That is because "at some level of generality almost all speech of [public] employees is of public concern[;]" so in addition to "the 'importance' of the issue" spoken about, courts must consider "the hat worn by the employee when speaking"— that of a citizen or employee. *Id.*

Here, the concerns of work hours by another employee raised by Turner do not go beyond a "personal employer-employee dispute," *Sagle*, 411 F.3d at 186, or "internal expressions of concern or complaint about the operation" of CPU. *Marceaux v. Lafayette City-Parish Consol. Gov't*, 614 F. App'x 705, 710 (5th Cir. 2015). The context shows that Turner acted in his role as Major Crimes Detective and believed it was his duty to report the issue—to ensure a crime wasn't committed. *Yul Chu v. Miss. State Univ.*, 901 F. Supp. 2d 761, 776 (N.D. Miss. 2012).

The form of his speech further demonstrates that purported speech is unprotected. Rather than immediately take his complaints to the public, Turner lodged his concerns with Chief Kelly, Mayor McKenzie, and Alderwoman Evans. So the content, form, and context factors all drive towards the same conclusion – Turner complained of internal issues within the police department as Major Crimes Detective, not a matter of public concern.

Additionally, to the extent that Turner argues that any complaint about overtime hours or the RMS software constitutes public concern, any such argument should be dismissed. The Fifth Circuit has held that a public employee's personal concern for his employment conditions and treatment are simply not matters of public concern for First Amendment purposes. *Warnock v. Pecos County*, 116 F.3d 776, 780 (5th Cir. 1997) (recognizing that a public employee's personal concern for "working conditions, job security, and the like" are not matters of public concern).

16

Federal law does not provide First Amendment protection to an employee's report of personal employment grievances up the employer's chain of command or an employee's more general complaint about allegedly inefficient operations. Accordingly, because Turner's speech related to his working conditions, Turner spoke as an employee of the City, and not a citizen. For this reason, Turner's First Amendment retaliation claim should be dismissed.[57] *See, e.g.*, *Gibson v. Kilpatrick*, 838 F.3d 476, 487 (5th Cir. 2016) ("Though the content of Gibson's suit was a mix of private and public concerns, private concerns predominate. Both the form and context of the suit show that it was a matter of private concern. Thus, we need not go on to weigh Gibson's interests in speaking against the city's interests in promoting efficiency. In short, the district court was correct: Gibson's First Amendment retaliation claim fails.").

### D.    The City's interest in promoting efficiency outweighs any First Amendment interest of Turner.

Assuming Turner engaged in citizen speech on a matter of public concern, "[t]he question [then] becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Lane v. Franks*, 573 U.S. 228, 237 (2014) (cleaned up). This question is answered through *Pickering* balancing, i.e., determining whether the plaintiff's interest in the matter of public concern is outweighed by the government employer's interest in promoting the efficient performance of public services through its employees. *See, e.g.*, *Lumpkin v. Aransas County*, 712 F. App'x 350, 359 (5th Cir. 2017) (discussing *Pickering v. Board of Education*, 391 U.S. 563 (1968)).

Three overarching rules govern the balancing test. First, the *Pickering* test is a question of law that may not be left for a jury to decide. *Kinney v. Weaver*, 367 F.3d 337, 363 (5th Cir. 2004)

---

[57] Exhibit B, Excerpts of Michael Turner's Deposition Tr., at 136–37 (Turner testifying that, despite his complaints about the limitation on overtime, he was still permitted to earn overtime if he "legit got called out," like he was required to physically go to the scene.).

("It is for the court to determine the importance of a plaintiff's speech interest, to determine the importance of a governmental interest in efficient operations, and to balance the relative weight of each."). Second, the *Pickering* test is a hypothetical inquiry, meaning that "it is assumed that the protected speech is the basis for the" alleged adverse employment action. *See, e.g., Smith v. Coll. of the Mainland*, 63 F. Supp. 3d 712, 717 (S.D. Tex. 2014) (Costa, J.). In other words, it is assumed that Johnson was terminated because of his protected speech. Third, the *Pickering* test focuses on "reasonable predictions of future disruption," not on evidence of actual disruption. *See Graziosi*, 775 F.3d at 741. These rules provide the parameters for weighing the parties' respective interests in this case.

The Fifth Circuit has emphasized that public employers have a "substantial interest in maintaining discipline and close working relationships" when making personnel decisions. *Id.* at 740–41. And it is clear that Turner's complaints satisfy the *Pickering* disruption prong. Specifically, the potential for disruption is obvious when Turner admits that he was acting like a smart-ass or to "piss off" the Chief of Police.[58] Moreover, the Board of Aldermen believed that Turner was actively attempting to be defiant toward his superiors at the time of his termination.[59] *See id.* at 740 (a public employer need not show that an employee's speech led to actual disruption; instead, the <u>potential</u> of future disruption will suffice). It goes without saying that the Chief of Police and those in positions within the police department at the City, like the Major Crimes Detective, must be able to work together to provide safety and investigatory services to the small community in the city of Columbia, Mississippi. *See, e.g., Bonds v. Milwaukee County*, 207 F.3d

---

[58] Exhibit B, Excerpts of Michael Turner's Deposition Tr., at 122 ("I did it to be a smart-ass.").

[59] *E.g.*, Exhibit E, Excerpts of Mike Smith's Deposition Tr., at 13–16; Exhibit G, Excerpts of Jason Stringer's Deposition Tr., at 11–12.

18

969, 982 (7th Cir. 2000) (explaining that the size of the public employer is relevant to the *Pickering* analysis).

Further, it is key that Turner's complaints were directed at individuals associated within the police department. As the Supreme Court has acknowledged, speech that is "directed at or concern[s] other public employees [] could have a serious and detrimental effect on morale." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 390 (2011)

Moreover, the balance tilts in favor of City because nothing has arisen from Turner's "complaints" about the police officer. Aside from speaking to the local investigator, no formal investigation by any state or federal agency has arisen because of Turner's efforts. This is significant because the Supreme Court in *Guarnieri* directed courts to consider whether there is any merit to the underlying complaints. 564 U.S. at 390 (explaining that "the Petition Clause does not protect 'objectively baseless' litigation"). Because nothing has come from Turner's complaints except the instant lawsuit, the value of Turner's speech is nil.

Therefore, even assuming Turner's complaints constitute matters of public concern, the *Pickering* balancing test weighs in favor of dismissal of Turner's First Amendment claim.

### E.    *Mt. Healthy* defense and Temporal Proximity

If Turner can show a sufficient causal link, and the above elements to establish a prima facie case, thereby shifting the burden to the City to affirmatively show that the City would have made the same decision even if the Board of Aldermen had retaliatory animus towards Turner, the City expressly reserves the right to make such a showing under *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). *E.g.*, *Haverda v. Hays County*, 723 F.3d 586, 591–92 (5th Cir. 2013) (if a plaintiff can make an initial showing of retaliation, the burden shifts to the defendant to prove a *Mt. Healthy* defense).

19

Additionally, because Turner lacks credible summary judgment evidence suggesting that the City bore unlawful animus during the termination decision, the City expects Turner to attempt to rely upon temporal proximity to save his claim.

"Close timing between an employee's protected activity and an adverse action again [him] may provide the 'causal connection' required to make out a prima facie case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997). But "temporal proximity standing alone is insufficient to establish an issue of fact as to pretext after an employer has provided a non-retaliatory reason." *Aryain v. Wal-Mart Stores Tex., LP*, 534 F.3d 473, 487 (5th Cir. 2008); *accord Vann v. City of Meridian*, No. 3:21-CV-305, 2024 WL 40008214, at *8 (S.D. Miss. Aug. 30, 2024) (Jordan, J.) (explaining that pretext "'alone is insufficient' to survive summary judgment at the pretext stage in the absence of 'other significant evidence of pretext'" (quoting *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 564 (5th Cir. 2019), *as revised* (Dec. 10, 2019))). As a result, temporal proximity cannot create a genuine issue of material fact as to pretext due to the nonretaliatory reasons for termination identified by the City. *Aryian*, 534 F.3d at 487.

## II.    Turner cannot establish an underlying constitutional violation of First Amendment retaliation against the City based on the failure to rehire.

Regarding Turner's failure to rehire claim, it is undisputed that no board member ever moved to rehire Turner and thus no board member voted in favor or against a motion to rehire Turner.[60] As such, and to the extent Turner raises a First Amendment claim based on the failure to rehire, Turner does not have a cognizable First Amendment claim for the failure to rehire because no official board action was taken.

Take *Touchard v. George County Mississippi School District*, No. 1:21-CV-168, 2024 WL 1130277, at *6 (S.D. Miss. Jan. 12, 2024), for example. In that case, the Southern District of

---

[60] Exhibit F, October 15, 2024 Board Minutes.

Mississippi found that a school district's non-hiring of their former superintendent as a school teacher could not be an official policy under *Monell* because the school board "never got a chance to approve or decline her hiring since [the former superintendent] was never presented" to the school board by the new superintendent. *Id.*

Like *Touchard*, the ability to hire or fire employees resides solely with the City's Board of Aldermen. And it is undisputed that the Board of Aldermen never voted on whether to rehire Turner.[61]

Yet even if Turner's non-hiring were an official policy, Turner lacks specific evidence linking his conversation with the local investigator as the "moving force" behind the failure to rehire decision. This means that such a policy is not actionable under § 1983. *See Touchard*, 2024 WL 1130277, at *6; *see also Mt. Healthy City Bd. of Ed.*, 429 U.S. at 285 (holding that even if a teacher's protected speech "played a part, substantial or otherwise, in [the] decision not to rehire," the teacher had no right to be rehired "if the same decision would have been reached" without the protected speech.).

Alternatively, and to maintain brevity, the City expressly incorporates all previously presented arguments herein, as they are largely the same. That is, Turner lacks causation, citizen speech, a matter of public concern, and cannot over *Pickering* balancing on this claim. Particularly, Alderman Smith testified that, even by the October 15, 2024, board meeting, he was unaware that Turner had spoken to the investigator, and he was also unaware of any complaints Turner made following his conversation with the investigator.[62] Likewise, Alderman Stringer

---

[61] *Id.*; *see also* Compl. [1-1] at 3–4.

[62] Exhibit E, Excerpts of Mike Smith's Deposition Tr., at 16–19.

testified that Turner's complaints were not brought to him.[63]  Accordingly, any First Amendment claim based on the absence of a decision to not rehire Turner should be dismissed.

## State Law

### III.    Turner's retaliation claim under the Mississippi Constitution must be dismissed for the same reasons.

Turner brings an identical free speech claim under the Mississippi Constitution.  This claim must be dismissed for the same reasons as the federal law claim.

The City has already analyzed Turner's right to free speech claim in the context of the United States Constitution, and the arguments asserted by Turner in his complaint under the Mississippi State Constitution are no different than those asserted under the United States Constitution.  Thus, for the same reasons discussed above under the federal constitutional analysis, the Court must dismiss Turner's state law right to petition and procedural due process claims.  *See, e.g.*, *A & T Express, LLC v. Town of Prentiss*, No. 2:23-cv-85-HSO-BWR, 2024 WL 4104287, at *9 (S.D. Miss. Sep. 6, 2024) ("Mississippi Constitutional claims should be considered together with its federal claims[.]"); *see also James v. Thompson*, 356 So. 3d 86, 90 (Miss. 2022) (conduct was protected under the First Amendment of the United States Constitution and article 3, section 13, of the Mississippi Constitution); *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) (affirming dismissal of the state-law claims where state constitutional claims mirror federal claims under Section 1983 and Mississippi courts have generally held the same).

### IV.    Turner's state-law wrongful discharge claim must be dismissed.

Mississippi is an at-will employment state, meaning an employee can be terminated for good reason, bad reason, or no reason at all.  There is a narrow exception to the at-will doctrine: an employee cannot be terminated for refusing to participate in an illegal act or for reporting the

---

[63] Exhibit G, Excerpts of Jason Stringer's Deposition Tr., at 13.

illegal acts of his employer.  *McArn v. Allied Bruce-Terminix Co.*, 626 So. 2d 603, 607 (Miss. 1993).  Turner is attempting to travel under this narrow exception.

The starting point is sovereign immunity. The City has not waived its sovereign immunity for a *McArn* claim under the MTCA.  The MTCA provides that a municipality can only be held liable for a tort of its employee if the tort is in the "course and scope" of the employee's employment.  MISS. CODE § 11-46-7(2) ("[N]o employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties.").  Certain intentional conduct, including conduct that rises to the level of malice, falls outside the course and scope of employment, such that a municipality retains its immunity.  *See Zumwalt v. Jones County Bd. of Sup'rs*, 19 So. 3d 672, 688 (Miss. 2009).

Although it has never been directly addressed by Mississippi appellate courts, inherent in a *McArn* claim is an element of malice—that Turner was intentionally terminated due to his reporting of alleged illegal activity.  *See McArn*, 626 So. 2d at 606 ("The theory is based on an implied covenant of good faith and fair dealing, when breached by malicious termination or harassment, gives the victim a tort action for wrongful discharge.").  There can be no negligent termination under *McArn*; there must be a causal link between the reporting of illegal conduct and the discharge.  Therefore, the City cannot be liable for Turner's *McArn* claim.

Alternatively, even if this Court finds that malice is not an essential element of a *McArn* claim, the City is immune under the MTCA's discretionary-function immunity provision, as courts have long held that at-will employment decisions are discretionary.  *See*, *e.g.*, *Bailey v. City of Pearl*, 282 So. 3d 669, 677 (Miss. Ct. App. 2019) ("[M]atters dealing with personnel, including the hiring, supervision and training of employees were determined to be discretionary functions in the post-*Wilcher* case of *City of Clinton v. Tornes*, 252 So. 3d 34, 40 (¶23) (Miss. 2018).");

PD.53870361.1

*Pennypacker v. City of Pearl*, Case No. 3:14-cv-00262-G-A, Doc. No. 70 (S.D. Miss. 2017) ("The City of Pearl aldermen, acting within the course and scope of their employment, had discretion to terminate the plaintiffs' employment.  Accordingly, the MTCA provides immunity to the City[.]").

Even if the City is not immune, though, Turner's *McArn* claim is tenuous in substance and fails for the same reasons as his federal claim—namely, that he cannot show the Board of Aldermen's termination decision was based on his report of alleged illegal activity.  Further, Turner cannot even show that a majority of the Board of Aldermen knew of his conversation with the local investigator at the time of termination.  *See, e.g.*, *Dismuke v. City of Indianola*, 32 F. App'x 126, *4 (5th Cir. 2002) (holding that, for *McArn*, the plaintiff must present evidence establishing causation between the reporting of the alleged misconduct and the decision process resulting in the discharge); *Schuh v. Town of Plantersville*, No. 1:13-CV-101, 2014 WL 7199271, at *13 (N.D. Miss. Aug. 22, 2014) (granting summary judgment because "[t]here is no evidence that the Board of Aldermen, the undisputed decision-making body of the Town of Plantersville" had knowledge of the alleged request for criminal conduct); *Kent v. Vicksburg Healthcare, LLC*, No. 5:10-CV-195, 2012 WL 1556511, at *15 (S.D. Miss. Apr. 30, 2012) (granting summary judgment where the court was unable to determine that the decision maker was aware of the report of illegal activity, and even if the decision maker had been aware, there was no evidence to show that the decision to terminate was based on the alleged reports); *Buchanan v. Ameristar Casino Vicksburg, Inc.*, 852 So. 2d 25, 27 (Miss.2003) (finding no McArn violation where plaintiff made no allegation that she was terminated for reporting illegal acts performed by the employer)

For all of these reasons, Turner's *McArn* claim must be dismissed.

## CONCLUSION

Defendant the City of Columbia's motion for summary judgment should be granted in its entirety, dismissing all claims.

Dated: October 15, 2025.

Respectfully submitted,

**PHELPS DUNBAR, LLP**

BY:   */s/ Loden P. Walker*

G. Todd Butler, MB #102907
Loden P. Walker, MSB #105996
1905 Community Bank Way, Suite 200
Flowood, Mississippi 39232
Post Office Box 320159
Flowood, Mississippi  39232
Telephone: 601-352-2300
Telecopier: 601-360-9777
todd.butler@phelps.com
loden.walker@phelps.com

**ATTORNEYS FOR DEFENDANT
CITY OF COLUMBIA**

25

## <u>CERTIFICATE OF SERVICE</u>

I, Loden P. Walker, do hereby certify that I have this date electronically filed the above and foregoing *MEMORANDUM IN SUPPORT* with the Clerk of the Court and provided the same to the following:

Daniel M. Waide, MSB #103543
1300 Hardy Street
P.O. Box 17738
Hattiesburg, MS 39404
601-582-4553 (t)
601-582-4556 (f)
dwaide@jhrlaw.net

**Attorney for Plaintiff Michael Turner**

So certified, this the 15th day of October, 2025.

*/s/ Loden P. Walker*
Loden P. Walker

PD.53870361.1